Good morning, Your Honors. My name is the court, Maria Severson, the appellant, Charles Jajdelski. It's my privilege to be here today for the first time in this wonderful courtroom before you. And I'd like to try to convince you that for four reasons. The first one is for the judgment to be granted. It should be reversed. First, there's triable issues that have raised to false claims submitted by Kaplan. Those relate to the documentation as far as the warrant for completion of false allegations and placement, which all have to do with eligibility to even be entitled to account for funds. They did this at Western Region, but they targeted most likely not to succeed. Counsel, here's my problem. As I look at our decisions and I look at your claim, I see lots of things that don't look good to a defendant's standpoint. But I don't see any evidence that's usually produced of a false claim having been filed with the government. I needed a name, I needed an invoice, a letter, something that said, this one was false and the government paid it. As in the government was damaged and you're entitled to come in as a key table or later and get the damages. Just a moment, just a moment. The evidence that we submitted was by Joan Finch, the Director of Education. She testified, someone who is a persecuted witness at one of the schools in Western Region, that she was asked to falsify the completion rates, the enrollment rates, that the directors asked her to do. She refused. Here's someone who I've been and interviewed for 30 years, actually resigned, left, because she was unwilling to do what the captain of Region 1 said. Did you see that there? Did you see the scheme? Definitely, things were not right in terms of what was going on here. And, of course, we have these other claims that the government came up with, 54 instances. But the fact that somebody says this was going on, you still don't have the link of where was the false claim or the evidence of the false claim that your client is going forward. Well, there's two ways you can get there. One is you can't get there from your testimony. Well, actually, I think you can. It is under the Certification Institute of the U.S. Supreme Court case in May by the Supreme Court Judicial Committee. It's only been 2018 there. The Supreme Court's been sending back a series of cases, actually, from the Supreme Court in May to make this decision. It talks about the certification issues and what there is. Any other questions? I guess you guys are looking for excuses. How do you understand the importance of certification? Well, that's a good question. But where is the false claim? The false claim is admitted by a couple in the U.S. by the discovery of these registries that were provided in support of our opposition to the suffrage judgments, that they are, in fact, joined down 24 times from not aware of the schools, but the Western Regional Schools, which have operated at least this year. That is not illegal, right? Right. It's illegal to jot down the Title IV funds if you're a judge. Yes. If you're a judge. So where do you get it from? Where does it get it from? Where does the budget come from? I mean, they may be doing it, but I just want to see it. Understood. In reviewing the evidence, I'm going to say there was a number of important evidence of their judgment. What you can look at is the fact that the director had demanded that these different placement numbers were used instead of dual numbers. And it's interesting, they were, in fact, used, and that's why I spoke up because I wanted to be part of it. Secondly, what you can look at is highly correlated evidence. When, in 2010, the Senate committee, the health committee, had looked at CAPA, along with so many of these for-profit schools, and pointed at saying, you know, default rates are outrageous, you need to see your enrollment rates. It's not that they actually gave a, it's just that they gave a full CAPA request of records. What happened? Within a month, suddenly, the Title IV money was, they came up with a commitment program, but they said, we're actually not going to drill down, because we're going to make sure these people are enrolled. Suddenly, the Title IV money drops 40%. So, are you sure they were honest with an exam or something? I mean, have you got a name of a student? Or a law graduate student. Yeah. Well, what we asked them, because of CAPA, not HIPAA, but because of the, because you have the only choice, right, you're not able to get the student names and so forth, and it's very hard to call a university with special names. What we were able to do is do it in the aggregate, which made at least a difference. At least the tribal issue, in fact, gets more juried, to decide whether there was a technical thing. You know, I won't belabor the cognate practices of targeting pro-self-esteem. It's not that you use criminalities as your target students. You have those people who, they say, don't even count as a package, because they're stated just getting formally and obsessively completed student enrollment. But I'd like to save some time for a rebuttal, so I'd like to move on to just a couple of points that I think would be sort of interesting to record. As far as signage that goes, notice reporting is also helpful in that regard. This is new to the HIPAA mix. HIPAAs, of course, were forged to tend to be conferred. The, you know, the ad revenue, that was, you know, caused the country to download the Washington Post. They needed to boost some capital to get more money with the institute. These are all incentives for a specific intent. And the fact that the director specifically asked for the director of education to falsify the records would be a pretty clear specific intent. As far as whether Kaplan is a proper party, Kaplan acquired heritage. Kaplan, and it says Kaplan, Kaplan Inc. There's an accident, payment, or merger. The SEC filings show that it was Kaplan Inc. Kaplan's senior management was involved in Mr. DeGioia's employment issues. And Kaplan Inc. Not the higher education department. I'm asking for Kaplan Inc. to be a proper party with at least a majority version of the facts. And lastly, the employment claims were never challenged by Kaplan. And nor were they ever communicated by the court on their merits. They were just something they never addressed. And we would ask that those be allowed to go forward. I'd like to take this opportunity to ask for a vote. Thank you. May it please the court, I'm Julian Cohen. On behalf of President Napoli and Kaplan Inc. I'd like to address first, I think, your Honor's crystallized point exactly. Where is the evidence of fudging here? Where is the specific claim that this case is controlled by the sports precedent which required and said it was a fatal flaw that required affirming summary judgment. Whereas here, the relator could not point to a single specific false claim or even a sufficiently detailed description of one. He couldn't identify or establish the existence of one. There is a lot of noise or a lot of vague allusions to law I'm doing. Much of which predates, if not all, predates the involvement of Andrew Kaplan, Duke's team, at Heritage College. Some of these, by their own admission, Ms. Fincher's declaration, Ms. Georgioski's declaration, they say, quote, several years prior. That's the one example of a faculty student they were able to come up with really role to, they themselves say, was a student several years prior to Kaplan Higher Education Corporation having acquired Heritage College from a separate, independent, third-party, Southwest Education Group policy from whom Kaplan Higher Education Corp., KAGC, had received assurances. Diligence had been conducted during the acquisition process of compliance with federal policy. Let me ask you about that. Let's just assume there's a factual issue about Kaplan and, of course, you're seeing the corporate bill, etc. If there is an example, an example plus all the other objects that are here, and even if it predated Kaplan, did Kaplan take responsibility in the corporate margin documents in effect to assemble claims? Well, I think to answer that hypothetical, Your Honor, we'd have to look at what the record shows here in terms of what KAGC did the first time KAGC, which is a separate corporate entity, but, again, we're assuming that away for purposes of your question. The first time we heard of any LISG proprieties, we, KAGC, which is not a defendant in this case, the first time KAGC heard of any LISG proprieties at Heritage College, which is what the record shows, was made up until December 2003. Within days, we dispatched our director, KAGC's Director of Dispatches, Director of Accreditation, and a 12-person audit team to conduct a six- to eight-week full-file review of just the mentioned 93 student files. KAGC voluntarily refunded to the Federal Department of Education a limited amount of money attributable to what had happened under the prior owner of Heritage College before receiving notice of any external review after investigation. So we can assume that... If you don't have the exact one, could itself choose the prior owner, though, in terms of its acquisition? Well, insofar as it did, you have to look, I think, Your Honor, at what type, on which we're assuming, is this combined entity, which it isn't. But, again, assuming, arguing under a way that KAGC is a separate corporate entity for purposes of your question, I think you'd have to look at what type, like, quote-unquote, which is really KAGC, Heritage is KAGC, did the first time you heard of anything. I think you're missing the point of my question. They said they stepped up to the plate. Right. And they may have cleaned up, but if there are other instances, my question is pretty simple, and maybe there's no documents of the record. Did Kaplan, in effect, step into the shoes because it was sitting through some parent entity because of the corporate acquisition, merger, etc., so that it would be responsible for, for example, at least the one student claim that was made? Well, the response to that, if I may, Your Honor, first of all, I don't believe, as Your Honor suggested, that the record shows one way or the other. I don't think there are enough corporate documents to say whether we assumed it and that certainly wasn't argued by a relator. And second, even assuming arguendo, that it did step into the shoes, I think for purposes of false claims and liability, you have to look at what happened the moment this fictional Kaplan entity put on the shoes, and the first time the record shows we had any kind of personal knowledge, deliberate ignorance, or recklessness, regardless of statutory standard 3729B4, so we entered a false thumbs-up. And what did we do? In this case, it's just like the Circus Decision in Miami that we cited in the 8th Circus Decision in Costa Rica. We immediately gave a plate and went to the feds, cleaned it up, returned the money before anyone said anything. We turned over many of, we, KAGC, that is not even Kaplan, a separate entity, turned over many of the documents to the Office of the Inspector General from the Department of Education in 2004. This is within about weeks of notice, first coming to anyone, any corporate officer or responsible individual at KAGC. But the fact that I quote, Kaplan not having made the false statement as opposed to what Judge McKeown was asking, which is whether Kaplan stepped into the shoes of the heritage for purposes of subjectly assuming there was proof of some, the evidence of some student who was a feminist. And again, Your Honor, first of all, I don't think the record allows us to answer that question. You simply aren't incorporating documents in the record to answer that one way or the other. If the Relators Council is aware of it, presumably she can point to them in a rebuttal. She certainly hasn't in the briefs that you were arguing this. Number two, even assuming Archie Lendo is a fictional Kaplan amorphous entity who pierced the veils, I mean, there's no evidence in the record that was for piercing the veil through at least two or three different layers of separate corporate entity ownership. Heritage KHEC is a separate Nevada corporation which owned Heritage College, centrally owned by KHEC, which was a Delaware corporation and subsequently became a Delaware LLC, separate management, separate boards, separate bylaws, separate financials. That's all uncontradicted in the record. For example, on page 1810 and page 1628-29 of the Executive Record, I noted that at that point, you get up to Kaplan Inc., a separate Delaware corporation which is engaged in many lines of business. And what's telling is, as I answered, they have never, to this day, come forth. They have, in time, never deposed or sought to depose anyone. At Kaplan Inc., or KHEC, or in Heritage KHEC, with knowledge of the evidence, cases just like Nelson v. Sanford Brown were the Seventh Circuit filled up. They didn't try to depose anyone. In order to present any documentary evidence to the relator of the defense, not to state there is no reliable issue. In fact, certainly, all of the subunits are just briefly returned into falsity. The Relator's Council suggests that somehow confidentiality restrictions impeded their being able to file 5 as an example, but that is completely false. And I think footnote 8 of our brief, on page 24, explains how easy it would have been for Mr. Chichelsky and his experts and his distinguished counsel to have found such an example. We made available, and it was KHEC made available to Relator's Council over 50 boxes of student records for all students enrolled in Heritage College in 2003. There's names on this in the files. They are in there, as long as this confidentiality thing is removed, because they could have asked for unique identifiers. They could have asked for serial numbers to correlate with the names to protect the privacy of individual students. They never asked for anything like that. They never asked for introductions. They never even bothered to ask for anything as to any of these 50 boxes. It would have been so easy if there were any examples of phantom students after KHEC or any confidentiality thing on the watch. It would have been so easy to find when it simply, as their own expert recognized, it simply didn't exist. They didn't have the documents, though. They were turned over. They were made available. The 50 boxes were made available. They were made available, and 38,000 pages of documents were produced over 13 months of discovery that was taking place. This case, when you say, you said they were made available, that they were offered and they didn't take them up, or you looked at the 50 boxes to tell, fine, as you do, because they were made available in a conference room where all counsel convened, and my understanding is that related counsel never asked. My understanding, as we noted in footnote 8 on page 24 of our brief, all they wanted to do was to copy one box, which contained general audit summaries, these broad numbers. So they would have received these under a confidentiality agreement. So they could have been worked out, but they never asked. They never asked. They could have been very easily done with unique identifiers. Yeah, numeric identifiers. You know, Jane Doe equals 22468, randomly generated number from a computer. Any of the number of discovery vendors could have done that. I mean, this case was filed in 2004. It's been under seal since 2008. It's already made one trip up to the circuit. Relators counsel and all their claims were dismissed other than this Fenton student claim, and now they're trying to quote again claims about talk of placement rates, completion rates, somehow being fabricated, very vague allusions to that, and those don't pertain to the Fenton student claim at all. They pertain to accreditation audit claims that this circuit stated very clearly in 2013, quote, we conclude that all of Mr. Gentileski's other allegations were properly dismissed. All we've got is Fenton students here, and you know what? They have not been able to find a single example of Fenton student in over a year. These are experienced counsel who prosecute these cases all the time, and they weren't able to find anything close to that position. We have no evidence in the record whatsoever on a single example post-acquisition, post-acquisition for placing rate in 2003 of any Fenton students. Thank you very much. We have some time for rebuttal. The merger agreements are in the record here, 839. Kaplan, Inc. is the one who produced the discovery. In this case, Kaplan, Inc., not K-A-G, is the one who had student information. Kaplan, Inc. is the one who produced the switch to the audit files that generally just did a handoff. Of course, those were required to, those that were required to go into repayment did not seem to match the numbers of others on the balance sheet. Interestingly, Kaplan, Inc. argues that we came in in 2003 as soon as we took over the Los Angeles campus and we cleaned it up, we got those records. However, how does that explain the very director of the school demanding that John Finchel, the director of education, falsify the conditional figures to say that all we were left with was Fenton students is an ingenious case material and the district court that we disciplined? Does he have any other case that suggests that we have evidence of a specific post-claim or some other document that shows a post-claim that you can, in the aggregate, simply allege bad acts or a scheme and still survive a dismissal and can get a case? Your Honor, there is a case law out there, and it's been highlighted in a three-page law in this petition, but I believe it's in the medical industry where they look at broad records as far as dismissals, and based on an expert, they make calculations in the aggregate. That is what we did here. We used that model, and we had a performer do notes, a US EPA go forward, look at their audit figures, and then those cases go to causation. Now that that data draws some causal connection, it's a not-too-close correlation issue, and it's enough to get past to get to the driver. It makes a driver's point. Okay, but here, what we're asking for is not some link to show that something caused something else. We're looking for whether a claim was made, a false claim was made, so I'm not so sure you can beat that analogy, and I understand what you're saying, and perhaps I was not clear, and you're not mine, so just take it away, and that is that here's the list of people who I would say, you know, we didn't use in the medical context, but here we used it in the enrollment and the Title IV claim process. The fact that they got paid Title IV money means that it was Title IV claims, so there were definitely claims. The issue is how many of those are false or fraudulent, and that can be done in a correlated way, by having it actually correlated. So we had those correlations done, and we also had an expert that works at a public university in Arizona, who testified against what you would expect to see if there's a fraud going on. Why do we have to rely on this correlation that you're asking us to rely on? Why can't we have a single actual false claim? Because the task is, the way things are reduced, and I take issue with what Dr. Rhodes said, as far as what we characterize, what happened to discovery, just in case, what you would see if, or what your site offered, there was boxes of documents, but they would not allow this to be copied with student names, to hold them. Did you make an effort, I mean, usually in these cases, whether it's this or any other case, you have a fairly complex confidentiality agreement, and you have masking, particularly in medical cases, for example, where you have individual patient names, their names submitted for claims, and you have masking, and you have identifying information. Was any of that done here, or tried to be done? To the extent it was done, it was by using the audits, which did not use student names. That's one of the reasons we went into that. As far as other discovery, all the stuff that I heard, actually was a false claim. When you correlate it with other information, it suggests that it does not conflict with any expert in the field of education, that works for any non-profit school, and testified that this is what you expect to see, this is what, if there's improper activity, this is what you expect to see. I see my time is out of bat. I would like to sum up with stating that nothing was claimed up direct or by heart. While this audit was going on by a key company, which, by the way, emerged, it emerged, it was a company, I don't know if you paid your attention to me, 39 of the record, company emerged with it, toward the heritage. There's enough of these, based on statutes of re-judgment, to create a tribalist effect, and allow a jury to decide whether this case, which was kept under seal for more than four years, standard is six months, maybe an extension, this was four years, the evidence was there, the people had lived calmly, they were unreachable, many of them. It was a very, very difficult case, so all of these discoveries, by virtual fact, that is nothing else, and we've had so much time, I guess, before we were even able to part of this discovery, which was held on December 14th, February 23rd, December 14th, in Duke, New Jersey. I'll speak first. Thank you very much. Thank you. I appreciate you. Thank you both. That was your argument this morning, the case of Jelsey v. Kaplan, is submitted. Our next case for argument will be the Republic of Marshall Islands v. The United States.
judges: McKeown, Bybee, Mollway